IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON BERNARD WILSON             :

                Petitioner             :

        v.                             :

RANDALL NERO                       :
  *Director, Patuxent Institution*              CIVIL ACTION NO. L-07-2598
                          :
      and                             :

DOUGLAS F. GANSLER                 :
  *Attorney General of the State of*            :
  *Maryland*
                          :
                Respondents

o0o

## <u>MEMORANDUM</u>

Pending is Brandon Bernard Wilson's ("Wilson") Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Counsel for Randall Nero, Director of the Patuxent Institution and Douglas Gansler, Attorney General of the State of Maryland, has filed a response to which Wilson, through his attorney Gary E. Bair, has replied. The matter is fully briefed and ready for disposition. After review of the pleadings, exhibits, and applicable law, the Court determines a hearing is unnecessary and relief is unwarranted. <u>See</u> Local Rule 105.6. The Petition is denied.

## BACKGROUND

On August 19, 2002, Wilson was convicted by a jury in the Circuit Court for Baltimore City of attempted first-degree murder, conspiracy to commit murder, and related offenses. Wilson was sentenced to a total of 50 years imprisonment, with all but 30 years suspended, and five years supervised probation. Wilson did not testify at trial.

At sentencing, Wilson, through counsel, moved by oral motion for a new trial based on

newly discovered evidence because the victim, Kenyon Wilmore, recanted his trial testimony

inculpating Wilson.  Although the motion was filed more than ten days after the verdict, the

court decided "in the interest of judicial economy" to hear the motion for a new trial.  After

hearing Wilmore's testimony and argument from counsel, the Court denied the Motion and

proceeded to sentencing.

### (i) Facts

The Court of Special Appeals of Maryland summarized the facts adduced at trial as

follows:

> In April 2001, the Baltimore City Police Department was investigating a
> homicide that occurred on the 500 block of Edgewood Street in Baltimore,
> Maryland.  About five or six days later, Kenyon Wilmore, the victim in the instant
> case, was arrested for attempted murder and a weapons offense.  He offered at
> that time to provide the police with information about the individuals involved in
> the Edgewood Street homicide.  Wilmore gave the police the names of Brian
> Troxler, John Fairley, and Corey Smith.  Those three individuals were
> subsequently charged in that homicide, and Wilmore became a principal witness
> for the State.  It appears from the record that, in exchange for Wilmore's
> cooperation with the police, the attempted murder charge was dismissed and
> Wilmore was acquitted on the weapons offense.

> When the Edgewood Street homicide trials commenced, Wilmore failed to
> appear on two separate trial dates in December 2001 and February 2002.  After
> Wilmore failed to appear the second time, the court issued a body attachment.
> Wilmore was arrested but released on February 19, 2002, after promising to
> comply with the subpoena and appear as a witness for trial on February 26, 2002.

> Four nights after Wilmore was released on the promise that he would
> appear at the upcoming murder trial, he was "[c]hilling" in his neighborhood
> when he saw [Wilson] drive by in his car.  Wilmore recognized the car because he
> had ridden in it several times.  Wilmore motioned for [Wilson] to approach him.
> Also riding in the car with [Wilson] were Melvin David and Keith Chase.
> Wilmore had known all three individuals for several years.

> Wilmore got into [Wilson's] car and the four individuals began driving
> around the area.  [Wilson] inquired whether Wilmore intended to testify against
> Troxler,  Fairley, and Smith in the Edgewood Street homicide.  Wilmore indicated

that he would do what he had to do, by which he meant he was not going to be

saying anything.  [Wilson] did not raise the subject again that evening.

As the men were riding in the car that evening, they were smoking marijuana. Wilmore had also taken ecstasy.  At some point during the evening, Wilmore fell asleep in the car.  He awoke to Chase's knocking on the car window and telling him to get out of the car.  None of the other men were in the car at this point.  As Wilmore exited the car, David shot him in his side, causing him to fall back into the car.  Wilmore then attempted to crawl into the front seat in an effort to drive away.  Before Wilmore could get into the driver's seat, [Wilson] shot him through the rear driver's window. The shot caused Wilmore to fall into the back seat. Wilmore then slid out the rear passenger's side door, where David was standing.  Wilmore pushed David aside and began to run away when Chase came around the front of the vehicle and shot Wilmore in the back.

Wilmore continued running away and heard another five to eight shots fired, none of which hit him.  As he ran, the other three individuals yelled profanities at him.  Wilmore ran to a road and rolled down a hill where he eventually landed by a stream.  He lay there a while and then crawled back up the hill onto the road where he lay on the yellow line waiting for a car to pass.

A police officer found Wilmore in the road and asked him who had shot him.  Wilmore said "Brandon" had shot him.  It was not until several days later, while Wilmore was still being treated for his injuries, that he told the police the names of the other two individuals who had shot him.  Wilmore explained that he delayed in revealing the identities of the other two shooters because he thought it was his fault.  Wilmore thought he was shot because he snitched on his friends. [Wilson], David, and Chase were thereafter charged by multi-count indictments with the shooting of Wilmore.

Exhibit 10, pp. 1-4 (footnote omitted).

### (ii)  Procedural History

Wilson appealed his conviction to the Court of Special Appeals of Maryland, raising

three claims of error:[1]

> i)      The trial court erred in admitting a letter written by a State's
>         witness who was not a co-conspirator especially when there was

---

[1] Wilson was represented by David Solomon, Esq. at pretrial proceedings, Warren A. Brown, Esq. at trial and sentencing, and Donald Daneman, Esq. at state post-conviction proceedings. Gary Bair, Esq. represented Wilson in his Application for Leave to Appeal the Denial of Post-Conviction Relief, Motion to Reconsider Denial of Application for Leave to Appeal, and in the instant proceeding.

no evidence that Appellant received the letter;

  ii)  The trial court denied Wilson his constitutional right to effective cross-examination by unduly restricting the exercise of that right; and

  iii)   The trial court erred in denying Wilson a new trial when the victim gave a sworn in-court recantation of his trial testimony implicating Wilson.

Exhibit No. 8, pp. 2-3; see also Exhibits 9 and 10.  On October 22, 2002, the Court affirmed judgment.  Maryland's intermediate appellate court found Wilson's first argument unpreserved for appellate review.   The Court rejected the second claim, ruling:

  [Wilson] conducted a thorough and aggressive cross-examination of Wilmore, repeatedly referring to him as a "snitch," "liar," and "drug dealer." [Wilson] drew out numerous inconsistencies in Wilmore's various statements under oath, and emphasized at length Wilmore's drug dealing and usage.  Finally, [Wilson] posed numerous questions that tested the credibility of Wilmore's testimony that he did not carry a gun.

Exhibit 10, p. 14.  The Court rejected Wilson's third claim, ruling there was no abuse of discretion in denying the motion for a new trial.  Id. pp. 18-19.  Wilson filed a Petition for Writ of Certiorari to the Court of Appeals of Maryland which was denied on February 13, 2004.

On January 4, 2005, Wilson initiated post-conviction proceedings in the Circuit Court for Baltimore City, faulting his trial attorney for:

  i)  accepting employment two days before trial but failing to request a continuance;

  ii)  failing to obtain Petitioner's permission to substitute another attorney for jury selection who was not adequately prepared to conduct jury selection;

  iii)  failing to obtain a witness statement from the alleged victim in the case until after trial;

  iv)  failing to cross-examine the alleged victim with a sworn recantation given during a related trial; and

4

v)     failing to file a timely motion for reconsideration of sentence.

Additionally, Wilson asserted he was denied effective assistance of appellate counsel.

Exhibit 13 and 17.   The Petition was denied after a hearing.

On September 15, 2005, Wilson filed an Application for Leave to Appeal in the Court of

Special Appeals of Maryland, asserting that he was denied effective assistance of trial counsel

because:

i)     counsel was retained the day before trial, failed to request a
       continuance, investigate the case, consult with his client, review
       prior counsel's file, or be present for jury selection;

ii)    counsel failed to learn of the key prosecution witness's recantation,
       failed to cross-examine on the recantation, and failed to learn of
       the statement in time to make use of it at the untimely motion for
       new trial; and

iii)   counsel failed to file a timely motion for reconsideration of
       sentence despite Wilson's request to do so.

Exhibits No. 17 and 18.

On May 16, 2006, the Court of Special Appeals of Maryland summarily denied Wilson's

Application for Leave to Appeal.  On June 12, 2006, Wilson filed a Motion to Reconsider Denial

of Application for Leave to Appeal.  On May 24, 2007, the Court of Special Appeals denied the

Motion for Reconsideration.

## STANDARD OF REVIEW

This petition is subject to the provisions of the federal habeas statute, 28 U.S.C. § 2254, as

amended, which provides a "highly deferential standard for evaluating state-court rulings,"

Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997).  See also Bell v. Cone, 543 U.S. 447 (2005)

(stating habeas court's standard for evaluating state-court ruling is highly deferential).  A federal

court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1)

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or  2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362 (2000).

Under the "unreasonable application: provision of § 2254 (d)(1), "a federal habeas court may not issue the writ simply because the court concludes, in its independent judgment, that the relevant state-court determination applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams v. Taylor, 529 U.S. at 411.  "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ignore whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.  See also Knowles v. Mirzayance, _U.S_ , 129 U.S. S.Ct. 1411, 1420 (2009).  ("The question 'is not whether a federal court believes the state court's determination' under the Strickland standard  'was incorrect but whether that determination was unreasonable- a substantially higher threshold.") (quoting Schiro v. Landrigan, 550 U.S. 465, 473 (2007)).

Ineffective assistance claims are reviewed under a two-part test established in Strickland v. Washington, 466 U.S. 668 (1984).  See also Bell v. Cone, 535 U.S. at 698-99 (2002) (explaining the interplay between Strickland and 28 U.S.C. § 2254(d)).  In order to establish infringement of a criminal defendant's  Sixth Amendment right to effective assistance of counsel, it must be shown that: 1) counsel's performance was deficient, and 2) the deficient performance prejudiced the defense.  See id. at  687.  Representation is deficient if it falls below "an objective standard of reasonableness."  Id. at 688.  It must be demonstrated that counsel's performance

was not "within the range of competence normally demanded of attorneys in criminal cases." Id

at 687.  The standard of review for assessing such competence is "highly deferential" and has a

"strong presumption that counsel's conduct falls within a wide range of reasonable professional

assistance." Id. at 669.  To prevail, the petitioner must overcome the presumption that the

challenged action might be considered "sound trial strategy." Id. at 689.  See also Meyer v.

Branker, 506 F.3d 358, 371 (4th Cir. 2007) (observing that it is "all too easy" to second guess

counsel's efforts after they have proven unsuccessful and warning about the distorting effects of

hindsight).

    A showing of prejudice requires that counsel's errors were so serious as to deprive the

defendant of a fair trial whose result is reliable and that there was a "reasonable probability that,

but for counsel's unprofessional errors, the result of the proceedings would have been different."

Id. at 690-94.   "The benchmark of an ineffective assistance claim must be whether counsel's

conduct so undermined the proper functioning of the adversarial process that the trial cannot be

relied upon as having produced a just result." Id. at 686.   A determination need not be made

concerning the attorney's performance if it is clear that no prejudice would have resulted had the

attorney been deficient.  See id. at 697.  In the context of a § 2254 claim, it is not sufficient for a

petitioner to convince the federal habeas court that the state court merely applied Strickland

incorrectly.  Rather, a petitioner must show that the state court applied Strickland to the facts in

an objectively unreasonable manner.  See Bell v. Cone, 535 U.S. at 698-99; Williams, 529 U.S.

at 405.

## PROCEDURAL DEFAULT

    Before Wilson may seek habeas relief in federal court, he must exhaust each claim

presented to the federal court by pursuing remedies available in state court.  See Rose v. Lundy,

455 U. S. 509, 521 (1982).  This exhaustion requirement is satisfied by seeking review of the

claim in the highest state court with jurisdiction to consider the claim.  See 28 U.S.C. § 2254(b)

and (c); O'Sullivan v. Boerckel, 526 U.S. 838 (1999).  In Maryland, this may be accomplished

by raising certain claims on direct appeal and with other claims by way of post-conviction

proceedings.  Exhaustion is not required if at the time a federal habeas corpus petition is filed the

petitioner has no available state remedy.  See Teague v. Lane, 489 U.S. 288, 297-98 (1989).

Where a petitioner has failed to present a claim to the highest state court with jurisdiction

to hear it, either by failing to raise the claim in post-conviction proceedings or on direct appeal,

or by failing to timely note an appeal, the procedural default doctrine applies.  See Coleman v.

Thompson, 501 U.S. 722, 749-50 (failure to note timely appeal);  Murray v. Carrier, 477 U.S.

478 (1986) (failure to raise claim on direct appeal); Murch v. Mottram, 409 U.S. 41, 46 (1972)

(failure to raise claim during post conviction); Bradley v. Davis, 551 F. Supp. 479, 481 (D.Md.

1982) (failure to seek leave to appeal denial of post conviction relief).

The procedural default doctrine bars consideration of a claim in a petition for habeas

corpus absent a showing of cause and prejudice, or actual innocence.  See Murray, 477 U.S. at

495; Wainwright v. Sykes, 433 U.S. 72, 86 (1977).  Even where a petitioner fails to show cause

and prejudice for a procedural default, a court must still consider whether it should reach the

merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice.  See

Schlup v. Delo, 513 U. S. 298, 314 (1995).  The miscarriage of justice standard is directly linked

to innocence.  Id. at 320.  Innocence is not an independent claim; rather, it is the "gateway"

through which a petitioner must pass before a court may consider constitutional claims which are

defaulted.  Id. at 315.  The miscarriage of justice exception applies where a petitioner shows that

"a constitutional violation has probably resulted in the conviction of one who is actually

innocent." <u>Murray</u>,  477 U. S. at 496.

The claims raised in the instant Petition are broader and different from the claims Wilson raised before the state post-conviction court at the circuit court level.  <u>See</u> <u>infra</u>, pp. 14-17.   The substance of a claim must be fairly presented in state court.  <u>See</u> <u>Joseph v. Angelone</u>, 184 F.3d 320, 328  (4th Cir. 1999).  Wilson neither argues cause and prejudice nor actual innocence to excuse procedural default.  Consequently, to the extent these claims are different than the claims raised before the state post-conviction court, they are procedurally defaulted.

## DISCUSSION

Wilson raises claims of ineffective assistance of trial counsel claims on federal habeas review.  Wilson's pre-trial and trial attorneys, as well as the attorney who assisted in jury selection, testified at the  evidentiary hearing on his state post-conviction petition.

### Testimony at State Post-Conviction Hearing

(i) David Solomon

David Solomon, Wilson's first attorney, testified that he represented Wilson for about one year before trial.  On Sunday, August 11, 2002, the day before pretrial motions were scheduled for hearing, Warren Brown notified Solomon by telephone that Brown had been hired as Wilson's counsel.  Solomon gave his case file to Brown and offered to review it with him, although they did not do so.  Solomon recalled that Brown said he would ask for a postponement.  Solomon told Brown it was unlikely that Judge McCurdy would grant a postponement.  Judge McCurdy had said previously there would be no further postponements after Wilson rejected a plea offer.  Exhibit 14, pp. 4-10.

(ii)  Warren Brown

Trial counsel Warren Brown, testified that he was hired by Wilson on August 11, 2002.

Brown stated that the hearing on the pretrial motion to suppress a photo identification in the case

was "part and parcel of sizing up the case." Id. p. 40.

> We had plea negotiations with Judge McCurdy, and I think the plea offer
> was 18 years- 15 years, 18 years, something along those lines, and so I wanted to
> get a sense of the witness– eyewitness that was going to be testifying against us to
> get a sense of how they did on the stand, whether or not they were going to
> vacillate, back off from any other statements that they may have given, and to get
> a sense of just how good this witness would be.

> I did impose upon the prosecutor, and the Judge agreed to keep the offer
> open, that is, even though we were challenging the evidence, just leave it open, let
> us get a sense of the value of this witness.  They agreed to do that, which was
> again, 18 years, and we had the– we had that hearing.

> * * * * * * * * * * * * *

> It really was– it wasn't to determine whether– anything about the inherent
> integrity of the identification.  We weren't under any impression that there had
> been any suggestiveness that it was unreliable.  Of course not.  Those guys knew
> each other.

> * * * * * * * * * * * * *

> And so we knew that that was not going to be the basis.  We were doing
> this simply to get a sense of what this witness was going to say and how they
> were going to come across on the witness stand.

> And, in fact, during the course of that motions hearing, the witness
> indicated that when the police first came upon him, he did not mention Brandon's
> name.  And so we jotted that down, and I put it in my memory bank to be used
> later on.  And, in fact, he was cross-examined about that and then tried to hedge
> about it.  But that was the purpose–and also, you know, to try to get a sense of,
> you know, do we need to take this 18 years or should we roll the dice, considering
> that you're facing life plus 20.

Exhibit 14, p. 40-41.

Brown could not recall the reason he asked another attorney, Rodney Gray, to assist in

jury selection.  When questioned whether he was ethically obligated to remain at the trial table

during jury selection, Brown said:

> The other thing is, no.  I didn't see it as any breach of any ethical
> obligation simply because I was having another attorney who was experienced,
> who had been a public defender, who had tried cases and picked juries both in at
> least Howard Court [sic] and Baltimore City to pick 12 individuals based on what
> we have to choose from when we pick a jury.
>
> I mean, let's not kid ourselves.  You know not what's in the minds of
> those folk. Almost always the selection is along racial grounds.  If you got a – you
> know, 99 percent of the cases in Baltimore City that are going to involve an
> African American, one thing you try to keep white folks off the jury because
> they're prone to convict.  And then you look for whatever constituency you might
> have and try to pick folk from that constituency to get them on a jury.  It might be
> women, it might be old folk, it might be young folk that you would think would
> be naturally aligned with you, you try to get them up there.
>
> But beyond that– and you know from years of experience that the
> information that we get on– from the jury commissioner is of such limited value
> that you know the joke is that you can almost pick 12 and put them in the box.
> So, no, there was not an issue with Rodney Gray selecting 12 individuals.

Id. p. 43-44.

Brown continued that the case was not the type where there was a "bonafide

constituency."  Id.  "[T]his was portrayed as, you know, thug on thug crime, so, no, there wasn't

any particular constituency other than just try to keep white folk off the jury."  Id.   Brown could

not recall why he left the trial table some 30 minutes after jury selection started.  Brown said he

did not abandon his client; Rodney Gray was an experienced criminal defense attorney who

"unlike the majority of the folk picking juries, was asking questions of the prospective jurors."

Id. p. 50.  Brown was satisfied with the jury selected.  Id. p. 81.  Brown could not recall how

much time he spent with Wilson or whether he interviewed witnesses.  Brown could not recall

whether he asked for a postponement.  Brown recalled receiving the case file from David

Solomon, which included the trial transcript from Brian Troxler's trial.  Brown did not recall

seeing the supplemental disclosure filed by the state on July 10, 2002.  The disclosure read:

> Be advised that witness Kenyon Wilmore has recanted his prior statements implicating [Brandon Wilson]. This was done during the trial, pretrial motions and deposition of *State v. Johnathan Farley and Brian Troxler* 101171032-39, in Part I commencing on June 6, 2002 through July 8, 2002.

Exhibit 16, p. 10.  The transcript from Troxler's trial was in the file David Solomon gave to Warren Brown.[2]

Brown's trial strategy was to discredit Wilmore by showing him to be a liar.  "In this case, there was no question that [Wilmore] was a snitch, that he was a dope dealer, that he would tell Judge McCurdy, "F— you." Id. at 62; see also p. 83.  Brown focused on corroborating physical evidence: the repainted car with the repaired window, shell casings from three different guns corresponding to Wilmore's statement about three shooters, a cell phone, broken glass at the scene of the shooting, and glass in Wilmore's clothing. Paper No. 14, pp. 80, 83; Paper No. 15, p. 80.  "So our whole thrust was, even if we were there, the mere presence at the scene of the crime is insufficient to convict."  Id. p. 63.  "It was clear that he's [Wilmore] not somebody to be believed, and if you read my closing argument, that's exactly what I zeroed in on."  Id.  Brown acknowledged that had he seen Wilmore's recantation, he would have used it "as just another indication to the jury that he's a liar."  Id. p. 72.  He "would have used it, no question about it."  Id. p. 91.  "But believe me, Kenyon [Wilmore] was, you know, raked over the coals as a result of that cross-examination."  Id. p. 92.

The jury saw a videotape of Wilmore's bail review.  Brown said it was "vile and you couldn't have paid for any better indication of the type of person that he was."  Id. at 81-82.  "In

---

[2]   Fairley and Troxler were Wilson's co-defendants. The cases were severed, and tried separately.

other words, his word was not worth a bucket of spit.  And that was the whole thrust of our whole case from the very beginning." Id. at 87.

Brown had no recollection of Wilson requesting him to file a Motion for Modification, but testified that he did not file a motion for modification of sentence because he believed Judge McCurdy would have denied it.  Id. at 77.

Brown did not bring Wilmore in as a witness in support of the oral motion for a new trial, although Wilmore testified.  Wilmore just came in.  "He had gotten his deal. Now he wanted his cake and eat it, too.  He did what they said to do, now he wants to be safe on the streets and not be a snitch, so he was going to come forth." Id. p. 95.  Brown had no expectation the Judge would find Wilmore credible, "but here he was, what was I not to do, just say, no I don't believe him, I'm not going to put him on?  So, we went forward and put him up there and let him say what he said." Id.

(iii) Rodney Gray

Rodney Gray,  a member of the bar for seven years, shares office space with Warren Brown and  helps Brown "with postponements and things of that nature." Id. p. 21-22.  Brown asked Gray to assist in selecting Wilson's jury.  Gray could not remember whether Brown said "he would be present while that selection was going on throughout its entirety, or he would be there initially and then he may have to leave." Id.  Gray was experienced trying cases and picking juries.  He had worked for three years as a public defender.  Gray had no opportunity to familiarize himself with the facts of the case.  Gray was not concerned when Brown left jury selection because he had "second chaired cases before.  I have selected jurors as a second chair before, so this was not something that was different for me than any other time when I was young in my career and I had second chaired and had selected a jury." Id. at 29.

(iv) Brandon Wilson

Wilson testified he discharged David Solomon prior to trial to hire Warren Brown.  He

met with Brown the day before the motions hearing and discussed the case and Brown's fee.

Brown told him that he would obtain a postponement.  Exhibit 15,  p. 13.  Wilson did not

authorize Brown to substitute Rodney Gray for jury selection, but never complained to Brown or

Gray.  Wilson acknowledged that he had known Wilmore for many years.  Brown promised that

he would file everything he could.  Brown had represented Wilson previously in an armed

robbery case which "got thrown out."  Id. at 22-23.  Brown had not met with Wilson before the

hearing which dismissed the armed robbery case.[3]

**Claims for Federal Habeas Relief**

Wilson contends the decision of the post-conviction court is contrary to or involved

unreasonable application of clearly established Supreme Court law or was an unreasonable

determination of the facts in light of the evidence presented.  The Petition presents three

ineffective assistance of counsel claims under the Sixth Amendment: i) trial counsel was retained

the day before trial but failed to request a continuance, investigate the case, consult with his

client, review prior counsel's file, or be present for jury selection; ii) trial counsel failed to learn

of the key prosecution witness's recantation, failed to cross-examine on the recantation, and

failed to learn of the statement in time to make use of it at the untimely motion for new trial; and

iii) trial counsel failed to file a timely motion for reconsideration of sentence despite Petitioner's

express request that counsel do so.  Petition, p. 5.

    **i)**       **Trial Counsel was Retained the Day before Trial but Failed to**

---

[3]  Wilson's aunt also testified.

**request a Continuance, Investigate the Case, Consult with his
Client, Review Prior Counsel's File, or be Present for Jury
Selection**

Wilson's federal claim is different than what was presented in his state post-conviction

petition.  The claim raised before the state post-conviction court was that Warren Brown

provided ineffective assistance by accepting employment two days before trial but failed to

request a continuance.  <u>Supra</u>, p. 4.   To the extent the claim was not fully presented before the

state courts, it is procedurally defaulted.

**(a)   Failure to Request Continuance**

The state post-conviction court recognized that Brown was working with a compressed

time-line to prepare for trial.  Brown first met with Wilson on Saturday, August 10, 2002;

motions hearings were scheduled for Monday, August 12, 2002, and jury selection was

scheduled for Wednesday, August 14, 2002.   David Solomon informed Brown that Judge

McCurdy had indicated there would be no postponements.  Wilson presents no evidence to

dispute this testimony or to show that postponement would have been granted.  As such, the

post-conviction court concluded "with the defense Mr. Brown planned to present, after meeting

with Petitioner and receiving the file from Petitioner's prior trial counsel ... further investigation

would have likely proved futile."  Exhibit 16 at 5.  The state court explained:

> This case hinged on the jury believing the testimony of the victim,  Mr.
> Wilmore. There were little credible defenses left for Mr. Brown to pursue,
> considering that Petitioner was placed at the scene, there were shell casings from
> three different guns and that the vehicle used in the crime was painted to change
> the exterior color.

> Mr. Brown testified that his defense strategy was to concede that
> Petitioner was present at the scene of the shooting, but was not the shooter.  This
> defense hinged on the credibility of the victim, Mr. Wilmore.  At the Post-
> Conviction hearing, Mr. Brown explained that his trial strategy was to attack this

witness by showing the jury that Mr. Wilmore was a liar, who dealt drugs, had cursed out the Judge on videotape, and changed his story in order to get his bail reduced, among other inconsistencies and credibility challenges.

Significantly, Mr. Brown testified that Judge McCurdy had previously announced that he would not allow for any more postponements in this case. And, Petitioner elected not to waive <u>Hicks</u> at his bail hearing on July 9, 2002. Even if counsel would have asked for a postponement, it appears it would not have been granted, nor should it have.

<u>Id</u>.

Although Brown, an experienced criminal defense attorney, had no recollection concerning the continuance, it is clear that he had a short period to prepare for trial. Brown's articulated defense strategy, to assess Wilmore at the suppression hearing and build a case by attacking his credibility, is supported by the trial transcripts. Wilson fails to overcome the presumption that trial counsel's actions may be considered an appropriate and necessary strategy under the circumstances. <u>See</u> <u>Strickland</u>, 466 U.S. at 689. Had Brown requested a postponement, the evidence presented was that it would be denied. Thus, Wilson cannot show that counsel's performance, even if it were deemed deficient, prejudiced the outcome of his case. Wilson's assertion that "surely" a continuance would have been granted is speculative. The evidence is insufficient to show that the state post-conviction court's decision applied <u>Strickland</u> in an unreasonable manner. In light of the deferential standard applied to state court rulings in § 2254 proceedings, the state court decision survives scrutiny.

**(b)  Jury Selection**

The claim presented in the Petition for Post-Conviction Relief was that Brown was ineffective for failing to obtain permission to substitute another attorney for jury selection, and the attorney was not adequately prepared to conduct jury selection. <u>Supra</u>, p. 4. The post-conviction court rejected Wilson's claim of ineffective assistance, stating:

16

The trial transcripts also indicate that Mr. Gray asked questions of all the potential jurors and moved to strike jurors when he believed it was necessary. Mr. Gray also made a <u>Batson</u> argument on behalf of Petitioner to ensure that he had a fair jury.

There is no indication that Mr. Gray's actions at voir dire, while aided by the Petitioner, were deficient. To the contrary, the transcripts reveal that Mr. Gray took an active, involved and effective role in the jury selection. Petitioner was present in the courtroom with both Mr. Gray and Mr. Brown, and did not make an objection to having Mr. Gray conduct voir dire.

The post-conviction court determined no prejudice was shown. "There is no indication that had Mr. Brown been present for jury selection, that the jury would have decided differently. Mr. Brown testified that had he picked the jury, that all he would have done is try to keep 'white people' off the jury, which is the same strategy that Mr. Gray said he used at Petitioner's trial." The transcript shows Gray appropriately questioned potential jurors and requested relief as appropriate. Notably, Wilson did not argue before the post-conviction court, nor does he here, that the jury selected was deficient or prejudiced the outcome of his trial. Brown testified that he was satisfied with the jury selection. The post-conviction court's decision is entitled to deference under the standard set forth in 28 U.S.C. § 2254, and there is no basis for relief.

ii)     **Trial Counsel Failed to Learn of the Key Prosecution Witness's Recantation, Failed to Cross-Examine on the Recantation, and Failed to Learn of the Statement in Time to Make Use of it at the Untimely Motion for New Trial**

Wilson raised claims of ineffective assistance of trial counsel before the state post-conviction court at the circuit court level for  i) failure to obtain a witness statement from Wilmore until after conclusion of trial, and  ii) failure to cross-examine Wilmore with a sworn recantation given during a different trial. To the extent Wilson raises claims on federal review not previously presented to the state courts, they are procedurally defaulted.

**A) Failure to Obtain Witness Statement Until After Trial**

17

The state post-conviction court rejected this claim, stating as follows:

[I]t appears that Mr. Brown only learned of Mr. Wilmore's recantation when Mr. Wilmore approached Mr. Brown a week before Petitioner's sentencing hearing.  There is no indication that had Mr. Brown interviewed Mr. Wilmore earlier, that Mr. Wilmore would have offered this information to Mr. Brown.  Mr. Wilmore testified that "he got a conscience" only a week before the hearing.

While the timing for Mr. Wilmore's conscience attack is unfortunate, the fact that Mr. Wilmore later recanted at this hearing, it does not rise to the level of ineffective assistance of counsel on Mr. Brown's part.  The Petitioner has not met the burden set by <u>Strickland</u> on this claim.

Wilmore's testimony at the hearing on the motion for a new trial includes the following exchange:

BROWN:   And, at trial, you indicated that Brandon was one of the people that was also shooting you, now you're saying that was not so, is that right?

WILMORE:   Yes.

BROWN:   Did you see him with a gun?

WILMORE:   No.

BROWN:   Why did you come in here and say you saw him with a gun?

WILMORE:   I was mad.

BROWN:   Did you ever tell the police that Brandon really was not involved?

WILMORE:   No.

BROWN:   Did you ever tell the prosecutor that Brandon was really not involved?

WILMORE:   No.

BROWN:   Did Brandon do anything out there that night relative to [your] being shot?

WILMORE:   Not that I know of.

18

Case 1:07-cv-02598-BEL   Document 7   Filed 07/17/09   Page 19 of 23

BROWN:          Did you tell anyone about this, this information that you
                have, that you're giving us now, prior to today?

WILMORE:        You.

BROWN:          When did you tell me that?

WILMORE:        About a week ago.

* * * * * * * * * * * * * *

BROWN:    Have you told anybody, excluding me, have you told
          anybody about what you're saying here today, prior to
          today?

WILMORE: No.

Exhibit 7, pp. 12-13.

Wilson's statement that the "entire case of the prosecution would have collapsed" had

Wilmore's recantation been presented to the jury, borders on hyperbole. There was other,

undisputed evidence at trial incriminating Wilson. The state court's decision is supported by the

evidence and entitled to deference. The record suggests that Wilmore cooperated with the state

during the trial, and did not offer to provide an exculpatory statement until after conviction.

There is no evidence that Wilmore would have provided this evidence had Brown contacted him

earlier. Under the deferential standard applied in federal habeas proceedings, the state court

decision is neither contrary to, or involved an unreasonable application of Strickland, nor was it

based on an unreasonable determination of the facts in light of the evidence presented in the state

court proceeding.

## B.  Failure to Cross-Examine Wilmore
## with Testimony from Trial of John Fairley

Wilson argued in his state post-conviction petition that Brown provided ineffective

assistance by failing to cross-examine Wilmore with a sworn recantation given during a related

trial. A transcript of Wilmore's testimony at Brian Troxler's trial was in the trial notebook

19

David Solomon gave to Warren Brown.  At Wilson's trial, Brown used Wilmore's testimony

from the Troxler trial for impeachment.  Exhibit 5, p. 13.  Brown did not use testimony from the

Fairley trial.  At the Fairley trial, Wilmore testified that Wilson did not shoot him.  Brown

testified at the post-conviction hearing that he was unaware of Wilmore's recantation at the

Fairley trial.

The post-conviction court rejected Wilson's claim that Brown was ineffective for not

finding and using Wilmore's testimony in the trial notebook for impeachment.   The post-

conviction court rejected the claims as follows:

> In his Petition for Post-Conviction Relief, Petitioner alleges that trial
> counsel failed to cross-examine the alleged victim with a sworn recantation that
> he had given during a related trial.  Specifically, Petitioner alleges that this
> information was made available to Mr. Brown through the trial notebook
> provided by Petitioner's first attorney, and that Mr. Brown was unfamiliar with
> the contents of the notebook at trial and did not know that the alleged victim
> recanted.
>
> At the Post Conviction hearing, the Defense questioned Mr. Brown to see
> if he had viewed a document submitted by the State.  This document was admitted
> at the hearing as Defense Exhibit One,[4] and was part of the trial notebook that Mr.
> Solomon gave to Mr. Brown to prepare for Petitioner's case.
>
> * * * * * * * * * * * * * *
>
> Mr. Brown testified that he did not see this document in the trial notebook,
> so he did not know that Mr. Wilmore recanted.  Mr. Brown also stated that he had
> only seen the transcripts of Brian Troxler, and not Johnathan Fairley.
>
> The law recognizes that a failure by trial counsel to present evidence that
> should be presented constitutes a deficient act.  Carroll v. Warden, 1 Md. App.
> 474 (1967).  However, evidence is not required to be presented unless it is shown
> that it would have been helpful.  Veney v. Warden, 259 Md. 437, 451 and White

---

[4]  See p. 11, supra.

v. Warden, 1 Md. App. 670, 674 (1967).

> The law provides that if trial counsel has a sound tactical reasons [sic] for his action, a court may not deem the action deficient.  State v. Mathews, 58 Md. App. 243 (1984).  The burden is on the Petitioner to prove the claimed deficient act could not be excused as a trial tactic.  Strickland, 466 U.S. 668 (1984).

> Here, Mr. Brown testified that his strategy was to have Mr. Wilmore name Petitioner as a participant in the crime, and show the jury the character of Mr. Wilmore as a liar, drug user, curser, and as a person who is only out to help himself.  Should he have used the sworn recantation by Mr. Wilmore, that would have been contrary to the strategy Mr. Brown employed at trial, in asking the jury to now believe the sworn testimony of Mr. Wilmore.

Exhibit 16 at 10-11.

The post-conviction court determined that Wilmore's recantation would be unhelpful and perhaps even counterproductive to the  trial strategy had Brown articulated.  Although trial counsel testified that he would have used the recantation, the defense nevertheless was able to elicit inconsistencies in Wilmore's testimony without introducing the recantation or risking the introduction of counterproductive evidence.  On this basis, the state court found Brown's representation did not rise to the level of constitutionally deficient representation.  Wilmore's recantation was not dispositive in the case against Wilson, given other evidence that Wilson was present at the shooting and was identified as a shooter by the seriously wounded Wilmore, who thought he was dying.[5]

Wilson  fails to present evidence sufficient to meet his burden to show that the state

---

[5] It appears that Wilmore feared retribution for his testimony.

court's rejection of this claim was unreasonable.  While a trial counsel's decisions are always subject to scrutiny in hindsight, tactical and strategic choices made by counsel after due consideration do not constitute ineffective assistance of counsel.  See Strickland, 466 U.S. at 689.  Wilson does not surmount the strong presumption that his counsel's performance during trial was within the wide range of reasonable professional assistance, and a federal habeas court does not scrutinize counsel's performance by looking at the decisions made in an after-the-fact manner.  Id. at 688-689; Bunch v. Thompson, 949 F.2d 1354 (4th Cir.1991).

### iii) Failure to File a Timely Motion for Reconsideration

Wilson faults Brown for failing to file a timely motion for reconsideration of his sentence, despite his request that he do so.  Pursuant to State v. Flansburg, 345 Md. 694 (1997), trial counsel is required to file a motion to reconsider at a defendant's request. Wilson identifies no federal constitutional right to counsel in regard to filing a post-conviction motion for reconsideration, and his claim is not cognizable on federal habeas review.[6]  Insofar as the post-conviction court credited Brown's testimony that he could not recall being asked by Wilson to file a motion for reconsideration, the state post-conviction court's findings are presumed correct and are supported by the record.  There is no cause to disturb the state court's ruling.

### CONCLUSION

For the reasons stated herein, relief is denied.  A separate Order follows.

Dated this 17th day of July 2009.

/s/

---

[6] Counsel's argument premised on Frazer v. South Carolina, 430 F. 3d 696 (2005) is not persuasive in this context because the facts and procedural posture differ. Frazer applied Roe v. Flores-Ortega, 528 U.S. 470 (2000), holding that counsel has a duty to discuss with defendant whether to pursue an appeal after a guilty plea.  In this case, a post-sentencing motion, rather than an appeal, is at issue.

_____
Benson Everett Legg
Chief Judge